UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 16-10226 (MLW) |
| CHARLES WASHINGTON, | ) ) | |
| Defendant. | ) ) ) | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

On August 10, 2017, defendant Charles Washington pleaded guilty to all of the counts in a five-count Indictment charging him with bank fraud conspiracy in violation of 18 U.S.C. § 1349 (Count 1) and bank fraud in violation of 18 U.S.C. § 1344 (Counts 2 through 5).  In its draft Presentence Investigation Report ("PSR"), the Probation Office correctly assigns Washington a Total Offense Level of 31 in Criminal History Category of IV.  The corresponding Guidelines sentencing range is 151 to 188 months.

For the reasons stated below, and consistent with its obligations in a plea agreement with the defendant (Docket No. 74), the United States requests that the Court sentence Washington to 126 months' imprisonment, 5 years' supervised release, and to pay $1,836,781 in restitution. The Court should also order the forfeiture agreed upon in the plea agreement.

## THE OFFENSE

Between August 1, 2013 and April 28, 2016, Washington and others conspired to make unauthorized withdrawals from victim accounts at federally insured banks, and to receive and withdraw money that they knew had been stolen from accounts at other federally insured banks and credit unions.  (PSR ¶ 8).  Washington and his coconspirators defrauded the victim banks

1

either by impersonating legitimate bank customers to make large withdrawals ("Account Takeovers"), (PSR ¶¶ 9-10), or by opening "Drop Accounts" in the names of shell companies to receive stolen moneys wired in from around the United States. (PSR ¶¶ 11-13).

Washington's Drop Account scheme, which accounted for more than $1.4 million out of an undisputed $1.8 million in actual losses, worked as follows. Washington recruited runners to open Drop Accounts in the runners' own names or in the names of non-existent businesses that the runners purported to control ("Shell Businesses"). Washington and coconspirators named the Shell Businesses as if they were title companies, property management companies, contracting businesses, and other businesses for which incoming large-dollar wire transfers and other deposits would not be unusual. Washington and coconspirators accompanied runners to municipal offices and paid for the runners to obtain business licenses for the Shell Businesses, and then took the runners to bank branches, where they used the business licenses to open the Drop Accounts in the names of Shell Businesses.

Washington checked the balances of the Drop Accounts to determine whether and when incoming wire transfers and check deposits had been credited to the Drop Accounts. (PSR ¶ 13). In the days immediately after the stolen funds arrived, Washington sent runners to withdraw money from the Drop Accounts in small intervals, "in an effort to drain the accounts". (PSR ¶ 11). Washington then checked account balances by phone again to verify how much his runners had withdrawn. (PSR ¶ 13).

The allegations in paragraphs 34 through 36 of the Indictment illustrate how the scheme "drained" the Drop Accounts.[1] After a coconspirator caused $78,539 to be wired into Runner

---

[1] Washington has agreed to the accuracy of the factual allegations in paragraphs 22 through 48 of the Indictment. Pl. Agr. (Docket No. 74), Agreed Statement of Facts, at 4.

C's Drop Account on March 29, 2016, Runner C withdrew more than 3/4 of the stolen amount in five separate withdrawals over three days before the victim banks caught on and stemmed the losses.

| DATE | DEPOSIT | WITHDRAWALS |
|---|---|---|
| 03/29/2016 | $78,539 | |
| 03/30/2016 | | $9,900 |
| 03/30/2016 | | $15,000 |
| 03/31/2016 | | $8,000 |
| 03/31/2016 | | $18,000 |
| 04/01/2016 | | $9,000 |

Similarly, on March 11, 2016, a coconspirator stole $70,000 from a Harvard University Employees Credit Union account and wired it to a Drop Account in the name of Runner A. (Indictment ¶ 25). Over the next three days, Runner A withdrew $58,000 — nearly 83 percent of the available balance in the Drop Account — before the victim banks were able to respond. (Indictment ¶ 26).

| DATE | DEPOSIT | WITHDRAWALS |
|---|---|---|
| 03/11/2016 | $70,000 | |
| 03/12/2016 | | $25,000 |
| 03/13/2016 | | $2,000 |
| 03/13/2016 | | $6,000 |
| 03/14/2016 | | $4,000 |
| 03/14/2016 | | $21,000 |

At other times, runners were unable to withdraw all (or any) of the stolen moneys before the banks caught on to the fraud. For example, on March 15, 2016, runner E.M.'s Drop Account — opened in the name of a title search company — received a $215,275 wire from a victim's account at the Commercial Bank of Kuwait. E.M. withdrew $178,000 from the Drop Account (about 82 percent of the balance) over the next five days. On March 21, 2016, another wire arrived from a different Kuwaiti bank, this time for $235,670. This time, E.M. made no withdrawals before this wire was reversed.

In the plea agreement, the parties have agreed to the following loss amounts:

| | |
|---|---:|
| Successful Withdrawals (Drop Accounts & Takeovers) | $1,836,781.00 |
| Attempted Withdrawals by Runners (Account Takeovers) | $167,100.00 |
| Attempted Withdrawals by Runners (Drop Accounts) | $38,000.00 |
| Wired in to Drop Accounts but not Withdrawn | $1,953,859.16 |
| Available in Accounts Taken Over but Not Withdrawn | $384,164.27 |

## THE GUIDELINES CALCULATION

The parties have agreed on all of the Guidelines calculations except one. Washington argues that the PSR is wrong when it assigns him an 18-level enhancement for loss of between $3.5 million and $9.5 million, U.S.S.G. § 2B1.1(b)(1)(J), when it should have applied a 16-level enhancement (for loss between $1.5 million and $3.5 million). *See* Defendant's Objections to the Presentence Report (citing U.S.S.G. § 2B1.1(b)(1)(i)). Relying on the uncontroversial proposition that "loss is the greater of actual or intended loss," U.S.S.G. § 2B1.1, Application Note 3, Washington argues that the Court should not add together the agreed upon actual losses (of ~$1.8 million) and the ~$1.95 million more that the scheme wired into Drop Accounts but was unable to withdraw before the victim banks reversed the unauthorized wires. Instead, Washington claims that the Court should choose only the "greater" figure (*i.e.*, the ~$1.95 million in unsuccessful attempts), which is below the § 2B1.1(b)(1)(J) threshold of $3.5 million.

Washington's argument is inconsistent with the Guidelines definition of loss. While the Court must choose the greater of "actual loss or intended loss," intended loss still includes the $1.8 million in actual losses that Washington caused. These $1.8 million in actual losses, certainly intended, are a subset of the intended loss and must be added to the other $1.95 million

in intended losses (*i.e.*, the unsuccessful attempts). *See United States v. Mickens*, 453 F.3d 668, 671 (6th Cir. 2006) ("The intended loss necessarily includes all actual losses, because actual loss is merely a loss that [the defendant] intended to inflict and did inflict."); *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) ("Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose.").

In other words, intended losses are not limited to the $1.95 million in unsuccessful wires – the "greater" figure that Washington would have the Court apply. Instead, the intended losses in this case include the actual losses of $1.8 million and the more than $1.9 million in attempts, for a total of $3.7 million. The Court should accordingly apply the 18-level enhancement for loss of between $3.5 million and $9.5 million. U.S.S.G. § 2B1.1(b)(1)(J).[2] The resulting GSR based on a Criminal History Category of IV, which is otherwise undisputed, is 151 to 188 months imprisonment.

## THE REQUESTED SENTENCE

The Court should impose a 126-month sentence, to be followed by 5 years' supervised release. A 10 year and 6 month sentence, while below the advisory GSR, reflects the need for the sentence to comply with the purposes of punishment set forth at 18 U.S.C. § 3553(a)(2).

This was a serious offense — one that netted more cash than a score of the typical bank robberies that are charged annually in the District of Massachusetts. Agents seized only $4,000 from Washington when they searched his apartment in April 2016, which leaves some $1.796

---

[2] No matter how the Court resolves Washington's objection to the Guidelines loss calculation, the United States is requesting that the Court sentence Washington below the applicable Guidelines range for the reasons set forth below.

million in withdrawn proceeds unaccounted for.  The victim banks, whether reimbursed by insurance companies or not, will inevitably pass their losses on to customers in higher interest rates and fees.  To protect accountholders' assets, the victim banks will also have to make it harder for their real customers (the banking public) to verify to their banks that they are authorized to make withdrawals.  The individuals whose accounts Washington and his coconspirators took over will also experience the inconvenience of being identity theft victims, and the unease of never knowing for certain whether their personally identifiable information is secure.  All of these factors counsel in favor of a significant sentence.

The requested sentence is also necessary to deter others from engaging in fraudulent schemes like Washington's.  According to a recent study-survey, the number of identity fraud victims increased 16 percent in 2016, to approximately 15.4 million customers.  The same study noted that account takeover losses specifically rose by 61 percent in 2016 to $2.3 billion, with victims paying an average $263 in out-of-pocket costs and spending 20.7 million hours resolving this type of fraud.  *See* http://www.darkreading.com/cloud/identity-fraud-rose-16--in-2016/d/d-id/1328027 (visited Dec. 18, 2017).  With account takeover fraud so prevalent, the prospect of lengthy jail terms is an important barrier to entry to these schemes, especially where the government cannot identify and prosecute even a small percentage of potential defendants.  There is also a particular need to deter mules and those like Washington who recruit them.  Few criminals possess the requisite skill to steal account and personally identifiable information, but anyone can be tempted to make unauthorized withdrawals for a commission.

The Court's sentence must also protect the public from Washington and discourage him from re-offending upon release.  The PSR shows Washington to have been a near-serial fraudster for more than 20 years.  He was first convicted of larceny in 1999 for dispatching runners with

fake IDs to buy merchandise with counterfeit checks, (PSR ¶ 49), an offense eerily similar to his offenses of conviction. He was convicted of larceny again in 2001, at age 27. (PSR ¶ 53). At ages 29 and 30, two more convictions followed for dispatching runners to pass counterfeit checks at a Rockland Trust. (PSR ¶¶ 55, 57). At age 34, he was convicted again and sentenced to two years in prison for passing fraudulent Traveler's Checks. (PSR ¶ 59). Washington was then convicted of cocaine trafficking and sentenced to three years in prison — a conviction later vacated in April 2017. (PSR ¶ 74).[3] There is accordingly ample reason to fear that Washington might return to fraud upon release, especially where he was on probation when he launched the scheme charged in the Indictment. (PSR ¶ 61). A significant sentence is necessary to encourage Washington to change course so that he does not spend the rest of his adult years in jail.

All of these things being said, since turning 18, Washington has never spent longer than 3 years in prison. (PSR ¶ 74). The proposed sentence of 10 years and 6 months would roughly triple any prior term of incarceration. While no mathematical equation can assure that Washington will not re-offend, a substantial increase over his prior jail terms should reinforce the Court's order that he never return to fraud.

---

[3] Because the Massachusetts Supreme Judicial Court vacated Washington's cocaine trafficking conviction in April 2017 — along with thousands of other cases swept up in the state drug laboratory scandal — Washington will be sentenced at Criminal History Category IV and not V. (PSR ¶ 74). Washington can only be described as having received a windfall, as Annie Dookhan served as neither a primary nor secondary chemist on Washington's case – she was simply the notary on the laboratory report. That is not to say that Washington's drug conviction should be scored for sentencing purposes, or that the Court should sentence Washington as if he were in Criminal History Category V. Rather, the Court should be aware that Washington was charged, convicted, and sentenced for a serious drug crime, and that he was on probation for this (then not vacated) offense in Suffolk County while committing the fraud for which this Court will sentence him.

The requested sentence would also reflect at least some potential for rehabilitation. Washington has a high school diploma, started college, and completed a title examination and real estate course. (PSR ¶ 105). He comes from a close-knit family in which his parents and each of his seven siblings have all worked or work productively. (PSR ¶¶ 79-87). He also has strong incentive to find lawful employment in his wife and three children (ages 20, 5, and 3).

As the PSR recommends, the Court's sentence should encourage Washington to seek treatment for gambling addiction and include conditions of release that prohibit him from gambling, sports betting, and visiting casinos. (PSR ¶ 100). Any sentence should also encourage and incorporate substance abuse treatment, given Washington's admitted use of marijuana to manage chronic pain (PSR ¶¶ 102-104) and indications that Washington was selling marijuana out of the Greenbrier Street apartment. (PSR ¶ 19(i-j) (search revealed marijuana, cash, a gun box, and ammunition).

CONCLUSION

For all of the reasons stated above, the United States asks the Court to sentence Washington to 126 months in prison, 5 years of supervised release, to pay $1,836,781 in restitution, and to order forfeiture as provided for in the parties' plea agreement. The United States requests that the Court not impose a fine to ensure that any money that Washington can pay is directed to the victims in the case.

    Respectfully submitted,

    ANDREW E. LELLING
    UNITED STATES ATTORNEY

    BY:/s/Seth B. Kosto_____
    SETH B. KOSTO
    Assistant United States Attorney
    One Courthouse Way
    Boston, Massachusetts 02210
    (617) 748-3230

December 26, 2017
Boston, Massachusetts

CERTIFICATE OF SERVICE

I hereby certify that I have caused a true copy of the Sentencing Memorandum of the United States on counsel for the defendant, Derege B. Demissie, Esq., via the ECF system.

/s/Seth B. Kosto
SETH B. KOSTO
Assistant United States Attorney

December 26, 2017
Boston, Massachusetts