UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
UNITED STATES OF AMERICA    )
                            )
v.                          )          Criminal No.: 16-CR-10226
                            )
CHARLES WASHINGTON          )
_____ )

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Charles Washington, by and through his counsel, hereby submits his Sentencing Memorandum for the Court's consideration and requests a sentence, pursuant to 18 U.S.C. §§ 3553 and 3661, that is sufficient but not greater than necessary to achieve the statutory goals of sentencing.

## I.    Overview

### A.  Introduction

An analysis of each of the factors enumerated in 18 U.S.C. § 3553(a), including the specific offence conduct, Mr. Washington' background and history, the need for deterrence, the prospect of recidivism, the impact on innocent third parties, and the direction of Congress to avoid sentencing disparities with similarly situated defendants supports a sentence of five years followed by 3 years of supervised release. The recommended sentence would best achieve the objectives listed in 18 U.S.C. § 3553(a)(2), as it would reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. Such a sentence would

1

also satisfy 18 U.S.C. § 3553(a)'s parsimony clause, which requires that the sentence be "sufficient but not greater than necessary" to accomplish the stated goals of sentencing.

### B.  Statement of Facts

Mr. Washington was charged with one count of Bank Fraud Conspiracy in violation of 18 U.S.C. § 1349 and four counts of Bank Fraud in violation of 18 U.S.C. § 1344.

The admitted allegations established that several individuals including Alvin Reeves, Khary Jones, Washington and others conspired to make unauthorized withdrawals from accounts at federally insured banks, and to receive and withdraw money that had been stolen from those bank accounts. The scheme involved impersonating bank customers and opening bank accounts in the name of shell companies to receive and withdraw the funds.

On August 10, Level 2017, Washington pled guilty to all counts of the five-count indictment.

### II.     The Offense Computation under the Sentencing Guideline Grossly Overstated Washington's Culpability

Under the Sentencing Guideline, the applicable Base Offense Level is 7. USSG §2B1.1(a)(1). But the Total Offense Level, after the addition of 27 levels for five adjustments, is 34. As a result, the Guideline Sentencing Range based on a Criminal History Category of IV is 151 to 188 months imprisonment. A closer look at each guideline enhancement reveals the guideline range has utterly failed to serve its purpose of measuring Washington's culpability and assisting the Court in arriving at a fair sentence.

Each enhancement applied by the probation department, although technically applicable, unfairly inflated Washington's culpability and role in the criminal enterprise. For example, the

2

18 level enhancement for economic loss was based on the loss calculation of 3.5 million to 9.5 million. The actual loss in this case is $1.8 million. The applicable enhancement based on that loss amount is 16 levels. The additional amount, $1.95 million related to unsuccessful wires, resulted in increasing the amount to $3.7 million, exceeding the 16 level enhancement threshold by a mere $200,000. Consequently, the 18-level enhancement for loss of between $3.5 million and $9.5 million was applied. U.S.S.G. § 2B1.1(b)(1)(J).

The amount Washington derived from the criminal activity is in the few thousands. When one considers that the same level is applicable to a Defendant who actually derived 9.5 million, the arbitrary and unfair result becomes clear. Washington was also just a stage up from the bottom level of the conspiracy. The overwhelming majority of the illegally obtained funds went Additionally, although Washington technically qualifies as a manager or supervisor under USSG §3B1.1(b), his actual role was that of an individual who acted under the direction of others above him. But because different individuals were involved as "Runners" in separate transactions, the adjustment is applicable. Again, the same enhancement applies equally to the individuals above Washington, who are much more culpable than him and who managed the entire conspiracy.

Finally, the adjustment for two separate special offense characteristics increased the level for similar activities. The adjustment for sophisticated scheme, under USSG §2B1.1(b)(10)(C), is intended to subject individuals who employ techniques designed to hide a criminal activity to increased penalty. The increase for the offense involving authentication features, under §2B1.1(b)(11)(B)(ii), is intended to do the same. Treating the creation of shell companies and identification cards as separate conducts that trigger separate enhancements, while technically

3

allowed, unfairly subjected Washington to higher penalty twice for essentially same type of

conduct.

### i.     The applicable offense level increase should be 16 under USSG §2B1.1(b)(1)(i).

The Application Note for the guideline provision states as follows:

Loss Under Subsection (b)(1).—This application note applies to the determination of loss

under subsection (b)(1).

(A)   General Rule.—Subject to the exclusions in subdivision (D), loss is the greater of actual
loss or intended loss.

The only way this rule makes sense is if the intended loss does not include the actual loss

as argued by the government and applied by the probation department. If the intended loss

always includes the actual loss, then the rule would not need to make a distinction between the

two.  It would simply have stated loss is determined by the intended loss. But the rule treats the

two as different and separate and calls for the application of the greater of the two. Admittedly,

the limited cases that addressed this issue held intended loss includes actual loss. *See United*

*States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000). Washington argues that approach contradicts the

plain language of the guideline provision.

Regardless, in this case, there is good reason not to apply the 16 or 18 level enhancement

based on the intended loss amount.

### A.  The Court Should Consider Other Factors, Including Personal Pecuniary Gain, As Opposed to the Intended Loss, to Arrive at a Just Sentence

Given the minimal gain Washington received and the sentences given to similarly situated,

separately charged, co-Defendants, the loss based enhancement is excessive and unfair. Indeed,

while, in theory, the "amount of loss is an appropriate proxy for the gravity of a defendant's

4

offense," the analysis does not end there. *United States v. Costello*, 16 F. Supp. 2d 36, 37 (D.

Mass. 1998). The Court looks "at the specific facts of the case... the human beings involved, the

nature of the charges, and the circumstances of the offense to determine whether the factual

circumstances... are of a kind or to a degree not adequately taken into account by the Sentencing

Commission." *Id* citing, 18 U.S.C. § 3553(b) (quotations omitted). In *Costello*, the court was

troubled by the application of the loss based enhancement in spite of a significant disproportion

between defendant's gain and the victims' loss. *Id* at 39. Indeed the court states, "[t]his is

precisely the question of "degree" not "kind," suggested by the language of 18 U.S.C. §

3553(b)(courts should consider an aggravating or mitigating circumstance of a kind, or to a

degree, not adequately taken into consideration by the Commission)." *Id.*

For this very reason, the Third Circuit has held that, "[w]here application of the Guidelines'

monetary tables bears little or no relationship to the defendant's role in the offense and greatly

magnifies the sentence, the district court should have the discretion to depart downward." *United

States v. Stuart*, 22 F.3d 76, 83 (3d Cir. 1994). Thus, though, "[l]oss under the Guidelines is

effectively a proxy for evaluating culpability, sometimes it is appropriate, and sometimes it is

not." *United States v. Watt*, 707 F. Supp. 2d 149, 155 (D. Mass. 2010) citing, *Costello* at 36.

Here, the question of degree versus kind becomes just as significant as the cases above. Where

the intended and actual loss is in the millions and Mr. Washington's monetary gain was only in

the thousands, a huge disparity exists warranting a significant departure from the advisory

guideline range.

Indeed, the guideline enhancements based on economic loss are widely criticized as

"arbitrary and too severe," by courts and legal scholars alike. *Parris*, 573 F. Supp. 2d at 754,

*Adelson*, 441 F. Supp. 2d at 506, 515, United States v. Watt, 707 F. Supp. 2d 149, 151 (D. Mass. 2010), *United States v. Corsey*, 723 F.3d 366, 377, 380 (2d Cir. 2013) (Underhill, J., concurring).[1]   Judge Jed S. Rakoff called the loss based enhancement a "draconian approach to white collar crime, unsupported by any empirical data.  *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

The loss-based enhancements have been ratcheted up in successive amendments to the guideline by the sentencing commission. Judge Rakoff explained that the changes have resulted in what he called arbitrary and draconian guideline in fraud cases.

> Another example of the deviation of the Guidelines from the original goals of the Sentencing Commission — and one more directly relevant to the instant case — is the huge increase in the recommended Guidelines sentences for securities fraud cases. The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data. Take the hypothetical but typical case described by Professor Kate Stith of Yale Law School, involving a typical securities fraud defendant who pled guilty to inflating the financial figures of a public company, thereby causing at least 250 shareholders to collectively suffer a reduction of more than $12.5 million in the value of their shares. In 1987, such a defendant would have faced a Guidelines sentence of 30-37 months; but by 2003, the same defendant would have faced a Guidelines sentence of 151-188 months, a more than 500% increase. *See* Kate Stith, Federal Sentencing: The One-Way Ratchet, New York City Bar Association First Annual Conference on White Collar Crime (May 2012). Was such a crime really 500% worse in 2003 than it was in 1987? Had any of the factors that underlie rational sentencing so radically changed as to warrant such a huge increase? *Id* at 351

---

[1] *See also* https://www.yalelawjournal.org/note/fifty-shades-of-gray-sentencing-trends-in-major-white-collar-cases.

Other judges have also added their voice to the criticism of the loss amount enhancements calling them "a black stain on common sense" *Parris*, 573 F. Supp. 2d at 754; "patently unreasonable" and "so run amok that they are patently absurd on their face" *Adelson*, 441 F. Supp. 2d at 506, 515;"of no help" *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010; and both "fundamentally flawed" and "valueless." *United States v. Corsey*, 723 F.3d 366, 377, 380 (2d Cir. 2013) (Underhill, J., concurring).

To ameliorate the severity of the loss table enhancements, and the inherent and unfair disparity that flows from the provision, the Court should consider, as some scholars and judges have suggested, the Defendant's own pecuniary gain[2]. In a testimony before the Sentencing Commission, the American Bar Association representative stated that the Commission's efforts to address the flaws of the fraud related guideline provisions

> "simply do not go far enough to reduce the unwarranted emphasis on both loss and multiple specific offense characteristics that, alone and especially in combination, tend to overstate the seriousness of many offenses." The ABA urged the Commission to go further than the proposed amendments by amending the fraud guideline to: (1) "place greater emphasis on mens rea and motive in relation to an offense"; (2) focus on "whether and to what extent the defendant received a monetary gain from the offense"; (3) consider "other circumstances that better reflect the culpability of the offender and the severity of the offense"; and (4) "reflect the general appropriateness of imposing a sentence other than imprisonment in cases where the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."[3]

---

[2] *https://www.yalelawjournal.org/note/fifty-shades-of-gray-sentencing-trends-in-major-white-collar-cases.*
[3] *https://ilr.law.uiowa.edu/print/volume-102-issue-3/judging-federal-white-collar-fraud-sentencing-an-empirical-study-revealing-the-need-for-further-reform/*

Given the minimal gain Washington received, a sentence of five years imprisonment followed by three years of supervised release would more accurately fit the crime.

**III.    Application of the 18 U.S.C. § 3553(a) Sentencing Factors**

**A.  History and Characteristics of Charles Washington**

1.  CHILDHOOD AND EDUCATION

Mr. Washington is a 44-year-old African American man born March 22, 1973 in Boston, Massachusetts. From 1973 to 2011 Mr. Washington lived in his childhood home in Dorchester, Massachusetts. He comes from a large supportive family as he is the youngest of eight children born to William Washington and Billie Brown Washington. Mr. Washington's childhood was complex as his parents worked long hours to support their children, and his father would drink alcohol as a form of stress relief from his job. Nevertheless his older siblings helped to support the family.

Mr. Washington attended Dorchester High School from 1988 to 1992 and graduated with a diploma. He studied liberal arts at Mass Bay Community College in Wellesley, Massachusetts from 1992 to 1993. He also completed a title examination and real estate course at Bentley University from May 1999 to July 1999.

2.  EMPLOYMENT HISTORY

Though his formal education is limited, Mr. Washington has maintained a consistent and impressive work ethic. For about three years prior to starting a business he was employed by Nexride Transportation out of Randolph working 40 hour weeks transporting various clients to various events.

Then, for at least three years, (2013 to 2016) Mr. Washington successfully started and operated the business J & C Property Management. He started the business with a partner, Jon Johnson, who he split profits with. Mr. Washington diligently worked approximately 30 hours a week. He has a diverse skill set as he would perform landscaping, painting, and snow plow services. Mr. Washington fully intends to resume work at J & C Property Management when he is released from prison.

3.   FAMILY HISTORY

Mr. Washington demonstrates an extreme appreciation and love for his family. The only markings on his body are tattoos bearing the names of his wife and children. Though Mr. Washington has known his wife for at least twelve years, he and Kim Wilkerson were married on February 23, 2014. Mr. Washington and Kim have two children together: Jhasai Washington (age 5); and Jhanai Washington (age 3). Kim also has two daughters who are the step-children of Mr. Washington: Kim (age 24); and Jaeda (17). He is very close with his children and his step-daughters and they speak almost daily. It is extremely difficult for Mr. Washington's children to be separated from their father. Mr. Washington has told his younger children that he is away at work, likely to spare them the hardships related to having an incarcerated parent.

Mr. Washington is also a proud father to his oldest son, Charles Washington Jr (age 20). Charles Jr. was born from a previous relationship. Mr. Washington has a very close relationship with his son, likely credited to the fact that he has had sole custody of Charles Jr. since he was only 12 years old. Charles Jr. does not have children and is currently living with Mr. Washington's sister while studying accounting at Newbury College.

9

Though Mr. Washington still has a large supportive family, his parents are sadly both deceased. His father, William Washington, died in 2013 at the age of 86 from cancer and dementia. Prior to passing he lived in a retirement community in Dorchester. Billie Brown Washington, Mr. Washington's mother, passed away from cancer in 2016. She unfortunately passed away just a week after Mr. Washington's incarceration. Mr. Washington has had a very difficult time coping with the death of his mother. The difficultly has likely been exacerbated by the fact that Mr. Washington was not able to attend her funeral due to his incarceration.

4.   PHYSICAL HEALTH

Mr. Washington has maintained good health, despite being the victim of dangerous attacks throughout his life. In 1991, Mr. Washington was robbed and shot in the knee with a gun. To this day he has a scar and screws in his knee, though the injury does not limit his mobility. Just two years later Mr. Washington was stabbed in the buttocks and in his left side during a house party. A piece of the subject used to stab him is still lodged in his left side near his rib cage.

Mr. Washington was also in a serious car accident around 2005, causing him to suffer from a back injury. To this day, he has difficulty sitting for long periods, getting up from a seated position and laying down. Mr. Washington was prescribed Percocet to treat the back pain, but found that this did not work. As Ibuprofen was also not addressing the pain, he began to use marijuana. He has been receiving a prescription for marijuana since 2014.

Mr. Washington is also currently being given medication at the Wyatt Detention Facility to regulate his cholesterol.

5.   MENTAL AND EMOTIONAL HEALTH

Understandably, Mr. Washington has suffered from depression since his mother passed away in June of 2016. Mr. Washington has had difficulty coping with his inability to attend his mother's funeral. Not surprisingly, he has difficulty sleeping at night. He was prescribed Benedryl and and then prescribed Vistaril 4 months later, however, he has stopped taking the medications as does not believe they helped with his condition.

6.   GAMBLING ADDICTION

Mr. Washington has struggled with a gambling addiction since 1995. He would go to Foxwoods Resort Casino, Mohegan Sun Casino, and Twin Rivers Casino at least once or twice a week before his arrest. He would spend anywhere from hundreds to a thousand dollars on each visit. He also engaged in sports betting, spending hundreds of dollars a day on college football and basketball games. Additionally, he played poker with his friends on weekends, betting approximately $500 each night. Mr. Washington understands his condition and is hopeful about receiving treatment for his gambling addiction.

7.   ALCOHOL AND DRUG ABUSE

Mr. Washington first started drinking alcohol when he was 17 years old. Just two years later he began to use used marijuana occasionally throughout his teenage years. However, Mr. Washington began using marijuana approximately twice a day in the mid-2000s after it was prescribed for a back injury caused by a car accident. Mr. Washington has recently realized that he has developed a marijuana dependency. He would often use more marijuana than he was planning, and when he tried to reduce his use he was unsuccessful. While this was the only

means he had of reducing his back pain, he believes that he has developed a problem with marijuana and would be interested in seeking treatment.

### B.  Nature and Circumstances of the Offense

The facts and circumstances of this case and the history and character of Mr. Washington call for a sentence of five years followed by 3 years of supervised release, which effectively puts him under the supervision of the government for eight years, well in his early fifties.

### C.  The Need for a Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public from Further Crimes

In the present case, a sentence of five years followed by a period of 3 years of supervised release reflects the seriousness of the offense.

### D.  Need To Avoid Unfair Disparity

Washington's sentencing request is in line with the sentences given to his similarly situated co-defendants. Alvin Reeves, a co-conspirator who played, arguably, a more prominent role than Washington in the conspiracy has pled guilty to an 11-count Indictment consisting of charges of Bank Fraud Conspiracy, in violationof 18 U.S.C.§§ 1349and 1344(Count 1); Bank Fraud, in violationof 18 U.S.C. § 1344(Counts2-10); and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1)(Count 11). On July 6, 2016, he was sentenced to 41 months of imprisonment and 36 months of supervised release.

Khary Jones, again, a co-conspirator in the same conspiracy was charged with and convicted of 1 count of Conspiracy to commit Bank Fraud in violation of 18 U.S.C.§§ 1349 and 1344; 8 counts of Bank Fraud, in violation of 18 U.S.C. § 1344; and one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1) (Count 10). On March 23,2016, he was sentenced to 24 months

and 1 day of imprisonment and 36 months of supervised release.

The sentence of 60 months is significantly harsher than the sentences given to Washington's co-conspirators who played, at least, similar roles as Washington.

## IV.  Conclusion

For the foregoing reasons, a sentence of 5 years imprisonment followed by 3 years of supervised release is sufficient but not greater than necessary to achieve the statutory goals of sentencing under 18 U.S.C. § 3553(a).


CHARLES WASHINGTON,
By his counsel

/s/ *Derege B. Demissie*
DEREGE B. DEMISSIE
DEMISSIE & CHURCH
929 Massachusetts Ave., Suite 01
Cambridge, MA 02139
Ph: (617) 354-3944
Fax: (617) 868-2520
dd@demissiechurch.com


Dated: January 9, 2017

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 9, 2018.


/s/ *Derege B. Demissie*
DEREGE B. DEMISSIE

14